**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                   )

**PUBLIC EMPLOYEES FOR**   )
**ENVIRONMENTAL**           )
**RESPONSIBILITY,** *et al.***,**    )
                   )
      **Plaintiffs,**      )
                   )
     **v.**            )     **Civil Action No. 12-748 (RMC)**
                   )
**U.S. ENVIRONMENTAL**    )
**PROTECTION AGENCY,**    )
                   )
      **Defendant.**     )
_____ )

**OPINION**

Dr. Richard David Hammer is a former employee of the United States Environmental Protection Agency. While working for EPA in Corvallis, Oregon, he filed a workplace complaint of harassment that was investigated by an outside contractor, Dr. Peter Maida. Dr. Hammer's efforts to obtain a copy of Dr. Maida's report were unsuccessful. Public Employees for Environmental Responsibility (PEER) filed a Freedom of Information Act request for the same report and was similarly unsuccessful. PEER and Dr. Hammer now sue EPA to obtain the report or at least the segregable findings of fact in it. The parties have filed cross-motions for summary judgment. Having reviewed the report *ex parte* and *in camera*, the Court will grant in part and deny in part the parties' cross-motions for summary judgment.

**I. FACTS**

Dr. Hammer joined EPA in 2007 as a Supervisory Life Scientist at the EPA's Western Ecology Division (WED) in Corvallis, Oregon. His immediate supervisor was Dr. Thomas Fontaine, and his second-line supervisor was Dr. Steven Hedtke. Dr. Hammer asserts that he encountered problems at WED that created a hostile working environment and other

1

difficulties.  Decl. Amy Battaglia, Def. Motion for Summary Judgment ("Def. MSJ") Ex., Att. P [Dkt. 5-1] (Oct. 1, 2009 Letter from Dr. Hammer to Dr. Hedtke ("10/1/09 Letter")) at 1.  When he sought reassignment because of "an untenable management situation which is negatively affecting my health," *id.*, EPA hired Dr. Peter Maida, a contractor, to conduct a fact-finding investigation into the complaints, Battaglia Decl. ¶ 4.[1]  Dr. Maida investigated and provided a report on his investigation to Dr. Hedtke.  *Id.*

As of December 2009, Dr. Hammer held the position of Branch Chief of Ecosystem Effects Branch.  10/1/09 Letter at 1.  By memo dated December 18, 2009, when Dr. Hammer was on leave status because of an unspecified medical issue, Dr. Hedtke reported to him:

> I have received and reviewed the results of the fact finding conducted in Corvallis.  I did not find a definitive support for a hostile work environment, in terms of how that is defined under EEOC[2] guidelines.  However, there was evidence of definite communication and management style differences which have lead [sic] to a breakdown of effective communication.

Pl. MSJ, Att. 1 [Dkt. 6-1] (Dec. 18, 2009 Letter from Dr. Steve Hedtke to Dr. Hammer ("12/18/09 Letter")) at 1.  Dr. Hedtke told Dr. Hammer that he was considering "such options as mediation, training, coaching and job reassignment."  *Id.* at 4.  It is Dr. Maida's report (Maida Report), summarized very briefly by Dr. Hedtke in the 12/18/09 Letter, that Dr. Hammer sought and that is the object of PEER's request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

---

[1] According to the requisition order, EPA contracted with the Key Bridge Foundation for Dr. Maida's services.  Battaglia Decl., Att. D [Dkt. 5-1], Doc. 1.

[2] EEOC stands for the Equal Employment Opportunity Commission, which enforces, *inter alia*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*

During his employment with EPA, Dr. Hammer submitted two FOIA requests and one request under the Privacy Act ("PA"), 5 U.S.C. § 552a, for a copy of Dr. Maida's contract, the Maida Report, and "[a]ll emails between Peter Maida and EPA that pertain to [Dr. Hammer] in any way." Battaglia Decl. ¶¶ 7–8. EPA released the contract and payment records related to its contract with Dr. Maida; it withheld the Maida Report under FOIA Exemption 5 (deliberative process). *Id.* ¶ 13. EPA reported that there were no emails between EPA and Dr. Maida. *Id.* ¶ 16. Dr. Hammer appealed only the denial of release of the Maida Report, but that decision was affirmed by EPA's Office of General Counsel ("OGC"). *Id.* ¶¶ 14–15; *see also id.* Att. F (Sept. 8, 2011 Letter from EPA denying appeal). In response to his PA request for the Maida Report and all supporting materials, EPA responded that the Maida Report was not maintained in a system of records and was, therefore, not subject to the Privacy Act. *Id.* ¶¶ 17–19. Dr. Hammer did not appeal the denial of his PA request. *Id.* ¶ 19.

Dr. Hammer filed an Equal Employment Opportunity complaint with the EPA Office of Civil Rights on June 1, 2011, alleging employment discrimination based on mental disability, harassment, failure to accommodate, and retaliation. *Id.* ¶ 5. After his discharge from EPA on November 3, 2011, Dr. Hammer filed a complaint with the Merit Systems and Protection Board ("MSPB"), alleging that his discharge lacked just cause. *Id.* Both complaints were settled by EPA and Dr. Hammer on January 31, 2012. *Id.* ¶ 6; *see also* Battaglia Decl., Att. A [Dkt. 5-1] ("Settlement Agmt."). By the terms of the settlement, Dr. Hammer withdrew with prejudice all appeals, complaints, grievances, claims, or civil actions against EPA "concerning any incidents, personnel actions, Agency decisions or determinations, or terms or conditions of employment" prior to January 31, 2012. Settlement Agmt. ¶ 4. He released EPA and its employees and agents from all liability for "any acts, omissions, allegations, claims or charges

occurring prior to" January 31, 2012.  *Id.* ¶ 5.  Dr. Hammer also agreed not to file "any new appeal, complaint, grievance, claim, or civil action" against EPA "concerning any incidents, personnel actions, Agency decisions or determinations, or terms or conditions of employment" prior to January 31, 2012.  *Id.* ¶ 6.  In return, EPA cancelled Dr. Hammer's discharge and recorded that Dr. Hammer had resigned.  *Id.* ¶ 9.  It also removed all references to his termination and all disciplinary actions underlying it from his Official Personnel File.  *Id.* ¶¶ 10–11.  Although the settlement was to be confidential, *id.* ¶ 13, the parties have agreed it can be, and has been, filed with the Court.  Dr. Hammer was represented by counsel in pursuing his FOIA/PA rights administratively and in negotiating the settlement agreement.

   Plaintiff PEER, a non-profit organization that works on behalf of EPA employees, submitted a FOIA and PA request to EPA on December 19, 2011, requesting the Maida Report and any supporting materials.  Battaglia Decl. ¶ 21.  EPA numbered the request HQ-FOI-00485-12 and acknowledged its receipt by letter dated January 4, 2012.  *Id.* ¶ 22.  EPA denied PEER's FOIA request on February 14, 2012, stating that the Maida Report was an internal briefing document for decision-making purposes and contained personal information of EPA employees and was exempt from disclosure under FOIA Exemptions 5, 6 and 7(c).  *Id.*  PEER appealed on March 5, 2012, and OGC denied the appeal on May 2, 2012.  *Id.* ¶ 23.  OGC informed PEER that the Maida Report "reflects internal discussions and recommendations that were considered during EPA's decision-making process" and contained "personnel . . . medical files, and similar files" relating to individuals other than Dr. Hammer and was, therefore, exempt from disclosure under the exemptions already stated.  *Id.* ¶¶ 24–25.  The OGC also stated that there was no reasonably segregable information that could be released.  *Id.* ¶ 26.

This lawsuit promptly followed on May 10, 2012.  PEER states that it filed its

FOIA/PA request in its own right and on Dr. Hammer's behalf, as its letter had indicated.  Mem.

Supp. Pl. MSJ ("Pl. MSJ Mem.") [Dkt. 6] at 27–28; *see also* Battaglia Decl., Att. L [Dkt. 5-1]

(Dec. 19, 2011 Letter from PEER to EPA ("12/19/11 Letter")).  The only document at issue here

is the Maida Report itself.  PEER does not contest EPA's statement that the agency conducted a

reasonable search for records and could not find any supporting materials to the Maida Report.

*E.g.*, Pl. MSJ Mem. at 4, 6 (stating only that "[t]he Maida Report is being improperly withheld").

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

be granted when "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted

against a party who "after adequate time for discovery and upon motion . . . fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).  In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position.  *Id.* at 252.

FOIA cases are typically and appropriately decided on motions for summary

judgment.  *Miscavige v. IRS*, 2 F.3d 366, 368 (11th Cir. 1993); *Rushford v. Civiletti*, 485 F.

Supp. 477, 481 n.13 (D.D.C. 1980).  In a FOIA case, the Court may award summary judgment

solely on the basis of information provided by the department or agency in affidavits or

declarations when the affidavits or declarations describe "the documents and the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*,

656 F.2d 724, 738 (D.C. Cir. 1981); *see also Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir.

1973). An agency must demonstrate that "each document that falls within the class requested

either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's

inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation

and quotation marks omitted).

### III.  ANALYSIS

Two points are immediately clear. First, Dr. Hammer cannot sue EPA because he

settled all claims against the agency on January 31, 2012—*after* PEER submitted the FOIA/PA

request. Second, PEER has no Privacy Act rights. Any claims advanced here by Dr. Hammer

must be dismissed, including all PA claims made by him or PEER. The only claim properly

before the Court is PEER's FOIA request for the Maida Report.

The settlement agreement is captioned with the MSPB case number, but its terms

are clearly all-encompassing to include the MSPB appeal "and any other appeal, complaint,

grievance, claim or civil action" filed by Dr. Hammer in the past *or* future, Settlement Agmt. ¶ 2,

as Dr. Hammer expressly promised not to institute any appeal, complaint, grievance, claim, or

civil action in the future, *id.* ¶ 6. Inasmuch as he had filed his own FOIA/PA requests for the

Maida Report, there can be no doubt that an identical FOIA/PA claim or civil suit by Dr.

Hammer was covered and precluded by the broad language of the settlement agreement. Dr.

Hammer is a highly educated man, and he was represented by counsel. A settlement agreement

is a contract, and Dr. Hammer is bound by the contract he signed. *See, e.g.*, *Shaffer v. Veneman*,

325 F.3d 370, 372 (D.C. Cir. 2003) (citing and quoting *United States v. ITT Cont'l Baking Co.*,

6

420 U.S. 223, 238 (1975) for the proposition that a "settlement agreement should 'be construed

for enforcement purposes basically as a contract'"); *see also Gaines v. Cont'l Mortg. & Inv.

Corp.*, 865 F.2d 375, 378 (D.C. Cir. 1989) (observing that the enforceability of settlement

agreements is "governed by familiar principles of contract law" (internal citations and quotation

marks omitted)).  The Court has no hesitancy in holding Dr. Hammer to the bargain he struck.

   The Privacy Act requires that "upon request by any individual," agencies must

allow that individual "to gain access to his record or to any information pertaining to him which

is contained in the system [of records]."  5 U.S.C. § 552a(d)(1).  Dr. Hammer filed a request

under the Privacy Act for a copy of the Maida Report and was informed by EPA that it was not

maintained in a system of records.  Battaglia Decl. ¶ 18.  He did not appeal this determination.

*Id.* ¶ 19.  He thereafter settled all claims against EPA and agreed not to make additional claims.

*See* Settlement Agmt. ¶¶ 2, 6.  Accordingly, the Court will grant summary judgment to EPA as to

all claims advanced by Dr. Hammer.

   PEER, the only remaining Plaintiff, has no rights under the Privacy Act to records

concerning Dr. Hammer.  An "individual" under the PA is "a citizen of the United States or an

alien lawfully admitted for permanent residence."  5 U.S.C. § 552a(a)(2).  Unlike FOIA, the PA

extends no rights to organizations or corporations.  *SAE Prods., Inc. v. FBI*, 589 F. Supp. 2d 76,

83 (D.D.C. 2008).  Corporations and organizations lack standing to sue under the PA,

which creates a cause of action for "individuals" as defined in 5 U.S.C. § 552a(a)(2).  5 U.S.C.

§ 552a(g)(1) (providing that "the individual may bring a civil action against the

agency"); *see Cell Assocs., Inc. v. Nat'l Insts. of Health, Dept. of Health, Ed. & Welfare*, 579

F.2d 1155, 1157 (9th Cir. 1978) (dismissing non-individual plaintiff for lack of standing under

Privacy Act).  Thus, while Dr. Hammer may, and did, provide written consent allowing EPA to

disclose records pertaining to him to a third party, such as PEER, only Dr. Hammer would have a cause of action under the PA. As the Court has already stated, Dr. Hammer waived that right, and PEER cannot assert it for him. With or without Dr. Hammer's explicit request, PEER's claim under the PA must be dismissed.

Which leads us to PEER's FOIA request for the Maida Report, the only document at issue. PEER has no complaint about the scope of EPA's search, which the Court finds was reasonable. *See Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (requiring a search that was "reasonably calculated to uncover all relevant documents"). Instead, PEER assails EPA's reliance on FOIA Exemptions 5 and 6 and EPA's position that, even if part of the Maida Report is nonexempt, those parts are non-segregable.[3] The Court addresses those three issues in turn.

## A. Exemption 5

Exemption 5 provides that FOIA does not apply to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Exemption 5 encompasses materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege. *Formaldehyde Inst. v. Dep't Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989), *overruled on other grounds by Nat'l Inst. of Military Justice v. Dep't of Def.*, 512 F.3d 677 (D.C. Cir. 2008); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (Exemption 5 includes all documents "normally privileged in the civil discovery context.").

---

[3] EPA also cited Exemption 7(C) in its administrative responses, but it does not rely on that exemption here. Def. MSJ Mem. at 10 n.2.

EPA relies on the deliberative process privilege, which exempts from disclosure documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears*, 421 U.S. at 150. Further, Exemption 5 "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Such documents are protected in order to promote "the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001); *accord Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) (the quality of decision-making would be seriously undermined if agencies were forced to operate in a "fish bowl" since open and frank discussion regarding legal or policy matters would be impossible).

To qualify for withholding, material must be both predecisional and deliberative. *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).

> A document is predecisional if it was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made. Material is deliberative if it reflects the give-and-take of the consultative process. [The D.C. Circuit's] recent decisions on the deliberativeness inquiry have focused on whether disclosure of the requested material would tend to discourage candid discussion within an agency.

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citations and internal quotation marks omitted).

EPA describes the Maida Report as an "aid to the EPA decision-making process with regard to how it would respond to the October 1, 2009, memorandum from Dr. Hammer, in which he requested an administrative reassignment and asserted allegations of a hostile work

environment." Def. MSJ Mem. at 12–13. EPA's FOIA officer, Amy Battaglia, describes the

Maida Report as containing "opinions on the credibility of facts provided by the interviewees,

findings of issues related to the allegations, recommended options and advice from Dr. Maida

about Dr. Hammer's allegations of a hostile work environment." Battaglia Decl. ¶ 31.

According to EPA, the factual information presented by Dr. Maida in the report is only Dr.

Maida's version of the facts, related in conjunction with his opinions. To this extent, the "facts"

as stated in the Maida Report really represent Dr. Maida's opinions and thus form part of the

deliberative process. *See* Def. MSJ Mem. at 13 (citing *Ancient Coin Collectors Guild v. Dep't of*

*State*, 641 F.3d 504, 513 (D.C. Cir. 2011) ("[T]he legitimacy of withholding does not turn on

whether the material is purely factual in nature . . . but rather on whether the selection or

organization of facts is part of an agency's deliberative process.")). Moreover, the Maida Report

was neither adopted nor incorporated into the final decision reached by EPA, making

inapplicable the rule requiring disclosure of deliberative material adopted as an agency's final

position. *Id.* Thus, EPA insists that the Maida Report is predecisional and deliberative and

protected by Exemption 5.

PEER could not disagree more. It contends that the deliberative process privilege

"protects advice, recommendations and opinions which are part of the decision-making process

of the government." Pl. MSJ Mem. at 6 (citing *Coastal States Gas Corp.*, 617 F.2d at 866). The

"key question," notes PEER, is "whether disclosure of the information would discourage candid

discussion with the agency." *Id.* at 7 (quoting *Access Reports v. Dep't of Justice*, 926 F.2d 1192,

1195 (D.C. Cir. 1991) (internal quotations omitted by PEER)). PEER asserts that the Court must

distinguish between "materials reflecting deliberative or policy-making processes on the one

hand, and purely factual, investigative matters on the other." *Id.* (quoting *EPA v. Mink*, 410 U.S.

73, 89 (1975) (stating that Exemption 5 applies only to "opinion" and "recommendatory"

portions of advisory documents, not factual information)).

        The dispute here boils down to whether the Maida Report contains some

information that is subject to FOIA disclosure even though some of it contains opinion and

recommendations that are protected by Exemption 5.  For this reason, the Court adopted PEER's

suggestion and reviewed the Maida Report *ex parte* and *in camera*.  Having conducted that

review, the Court concludes that the Maida Report is protected by Exemption 5 as deliberative-

process material except for the first three sections of the document, which comprise roughly the

first page and a half of the report and are segregable factual background paragraphs that do not

fall within the exemption.  The Court discusses those first three sections separately below,

addressing first whether Exemption 5 pertains to the Maida Report generally.

        PEER argues that the Maida Report has not been shown to be predecisional or

deliberative.  It accurately cites *Coastal States*, 617 F.2d at 866, 868, and *Senate of P.R. v. Dep't

of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987), for the proposition that an agency must

establish what deliberative process is involved and the role played by the document at issue in

that process.  Pl. MSJ Mem. at 8.  However, the record is clear that the deliberative process to

which the Maida Report contributed was Dr. Hedtke's determination of the nature of the

management issues at WED and what options he might consider.  Since Dr. Hammer was away

from work on his doctor's advice due to the circumstances of his workplace, his complaints

obviously were serious, and Dr. Hedtke specifically noted that.  *See* 12/18/09 Letter at 4 ("The

allegation you have presented is serious and I want to ensure that we do what is best for you and

the organization.").  The Maida Report contained recommendations on ways to respond to Dr.

Hammer's complaints, and Dr. Hedtke specifically notified Dr. Hammer what options he was

considering. *Id.* at 4–5 (discussing possible resolutions in section of letter titled "Next Steps").
None of these facts is contested.

While PEER correctly refers to "[t]he general rule that facts must be disclosed,"
even if opinions and recommendations may be withheld, Pl. MSJ Mem. at 13, that rule is almost
entirely inapplicable to the Maida Report.  The Court's *ex parte*, *in camera* review has confirmed
that, as EPA argues, this is not a case in which there is a separate section of objectively presented
and unvarnished facts falling outside the scope of Exemption 5.  There is no "factual summary"
or "findings of fact" section of the Maida Report.  To the contrary, to the extent that facts are
discussed regarding Dr. Hammer's allegations, they are considered in more analytical contexts,
tied inextricably to Dr. Maida's opinions and discussions.  *See Playboy Enters., Inc. v. Dep't of
Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982) (holding that Exemption 5 "does not protect 'purely
factual material appearing in . . . documents in a form that is severable without compromising the
private remainder of the documents'" (quoting *Mink*, 410 U.S. at 91)).

PEER further complains that the Maida Report "was commissioned to, *and
presumably did*, address additional questions, such as Dr. Hammer's allegations of threats
against him by management when he attempted to ensure WED complied with federal laws and
allegations of hostility (which may not have fit under EEOC guidelines), which [Dr.] Hedtke's
[December 18, 2009] memo did not address and have not been shown to be part of any agency
decision-making process."  Pl. MSJ Mem. at 8 (emphasis added).  PEER's assertions on the
scope of work for Dr. Maida are based entirely on hearsay and contradict the Scope of Work in
the EPA/Maida contract.  Battaglia Decl., Att. D, Doc. 2 [Dkt. 5-1] ("Scope of Work") ("The
National Health and Environmental Effects Research Laboratory has been asked to conduct a
fact finding session to elicit facts that will support, or not, an allegation of a 'hostile work

environment' in the Western Ecology Division, Corvallis, Oregon.").  After Dr. Maida's interviews, Dr. Hedtke advised Dr. Hammer that he doubted that a hostile work environment under EEO laws had existed, and PEER appears to agree—or at least it does not press the point here.  Further, Dr. Hedtke spoke generally of the failures of communication at WED, while not attributing blame to either Dr. Hammer or his supervisors.  *See* 12/18/09 Letter at 1 ("I did not find a [sic] definitive support for a hostile work environment . . . .  [T]here was evidence of definite communication and management style differences . . . .").  PEER only hypothesizes that portions of the Maida Report were not part of Dr. Hedtke's decision process, but its hypotheticals do not undercut EPA's reliance on Exemption 5.

As PEER argues, investigative and evaluative reports regarding personnel matters are not exempt under Exempt 5 when an agency fails to identify the final decision that was, or could have been, reached.  Pl. MSJ Mem. at 9 (citing *Vaughn*, 523 F.2d at 1146).  However, the lack of a final decision is not dispositive when an agency can establish that there was a deliberative process of which the withheld material was a part.  EPA has clearly established in this record that it was considering options to reduce the hostility and other problems Dr. Hammer perceived in his workplace and that Dr. Maida's Report contributed to that process.

Additionally, PEER complains that EPA has not shown that release of the Maida Report would "defeat, rather than further, the purposes of FOIA," characterizing EPA's allegations of possible harm as "conclusory."  Pl. MSJ Mem. at 10 (citing *Hall v. Dep't of Justice*, 552 F. Supp. 2d 23, 29 (D.D.C. 2003) and *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977)).  EPA responds that release of the Maida Report "would have a chilling effect on the Agency's ability to have frank, internal discussions on personnel matters between subordinates and their supervisors" and "would create confusion

13

surrounding the reasons and rationales that were not" the ultimate grounds for a final decision.

Battaglia Decl. ¶ 31.  In reply, PEER asserts that Ms. Battaglia merely parrots the statutory

language and offers no substance to support her conclusion.  Pl. MSJ Mem. at 10.  It also

contends that there were no internal discussions between subordinates and superiors because

employees spoke to Dr. Maida, not an EPA superior.  *Id.* at 11.  But this latter argument ignores

reality: Dr. Maida interviewed employees in Corvallis, subordinates and superiors alike, as a

direct agent of Dr. Hedtke and as a non-EPA person to elicit more candor.  Dr. Hedtke used this

procedure for the protection of Dr. Hammer, who had alleged that subordinates and superiors

were complicit in creating the alleged hostile work environment.  *See* 12/18/09 Letter at 1 ("I

obtained the services of an independent fact-finder to gather facts pursuant to your allegation and

requested the results be provided to me.").

Having reviewed the Maida Report *in camera* and *ex parte*, the Court finds that

release of more of the Maida Report than previously stated would pose a significant threat to the

ability of the Agency to have frank internal discussions on personnel matters.  *See Petroleum

Info. Corp.*, 976 F.2d at 1434 (D.C. Cir. 1992) (noting that the deliberative-process inquiry

"focuse[s] on whether disclosure of the requested material would tend to discourage candid

discussion within an agency").  In this particular situation, Dr. Hammer challenged the

supervision at WED and expressed grave concerns for his health and the prospects of retaliation.

Dr. Maida was retained from outside EPA to investigate Dr. Hammer's allegations.  His

interviews required candor from those to whom he spoke, and his report contains his conclusions

from those interviews, with varying degrees of attributed truth.  Obviously, although Dr.

Hammer was himself interviewed, much of Dr. Maida's attention and the ensuing report

reflected on the words and actions of others. Dr. Maida's insight into troubles at WED is exactly what Dr. Hedtke sought and obtained.

      The Court's conclusion that Exemption 5 protects most of the report does not extend to one segment thereof. The first three sections of the document, titled "Introduction," "Methodology," and "Documents That Were Reviewed," are not protected by Exemption 5 because they represent "purely factual material" that can be severed "without compromising" the rest of the report. *See Playboy Enters.*, 677 F.2d at 935 (internal quotation marks and citation omitted). These three sections describe Dr. Maida's general methodology. However, Exemption 6 requires redaction of certain identifying personnel information. Subject to such redaction, the three sections must be disclosed, as the Court discusses further in its segregability analysis.

## B.  Exemption 6

      Exemption 6 permits an agency to withhold from disclosure "personnel and medical files and similar files" if their disclosure would "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). If there is a FOIA request for such information, an agency must conduct a balancing test to determine if releasing the information would constitute a "clearly unwarranted invasion of personal privacy" by weighing the privacy interest in non-disclosure against any qualifying public interest in disclosure. *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 596 n.1, 601–02 (1982); *see also Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (noting that the government bears a "heavy burden" under Exemption 6 (internal citation omitted)).

      In contesting EPA's reliance on Exemption 6, PEER clarifies that it "does not seek disclosure of names mentioned in the report, but rather seeks disclosure of the facts relating to Dr. Hammer's allegations." Pl. MSJ Mem. at 17. EPA no longer relies on Exemption 6 to withhold the entire Maida Report; instead, it "maintains that much of the Report is exempt"

under Exemption 6.  Def. MSJ Mem. at 15 n.3.  Without additional specificity, EPA asserts that

"Exemption 6 covers the information in the Maida Report that would identify the individuals

mentioned or interviewed."  Def. Reply [Dkt. 9] at 8.  The persons interviewed offered their

perspectives on management and inter-personal issues at WED, and Dr. Maida assured them of

privacy so that they could and would speak freely without fear of harassment or retaliation.  As a

result, EPA contends that disclosing the names or comments of those interviewed would not

serve any general public interest in "shedding light on an agency's performance of its statutory

duties."  Def. MSJ Mem. at 14 (quoting *Dep't of Justice v. Reporters' Comm. for Freedom of

Press*, 489 U.S. 749, 750 (1989)).  EPA also argues that any segregable portions of the Maida

Report under Exemption 6 are nonetheless protected from release because the entire Maida

Report is exempt under Exemption 5.  *Id.* at 15 n.3.

        The Court finds that Exemption 6 privileges withholding significant portions of

the Maida Report. The Court reiterates that the report contains no separate recounting of facts.

Instead, such facts are only presented through the lens of Dr. Maida's opinions, analysis, and

recommendations.  To the extent that the report contains information revealed by interviewees

who spoke candidly so that Dr. Hammer's allegations could be addressed, those persons have a

compelling privacy interest in non-disclosure.  Thus, the PEER's reliance on *Fortson v. Harvey*,

407 F. Supp. 2d 13, 17 (D.D.C. 2005), for the proposition that "witness statements" are not

protected by Exemption 6 is of no relevance here.  Pl. MSJ Mem. at 19.  The Court does not rely

on *Fortson* because at issue here are *not* witness statements but, rather, Dr. Maida's condensation

of what he learned from a variety of witnesses, what he did and did not credit wholly, and the

reasons for his recommendations to address the issues.

The Court further concludes that PEER establishes no particular public interest in the Maida Report.  The record is clear that Dr. Hammer has an abiding interest in reading the report, but he has waived any and all rights he might have had to obtain the document under FOIA or the PA.  PEER generally assists EPA employees and therefore asserts a "public interest" in the Maida Report, but the privacy interests of the particular EPA employees who were interviewed outweigh this asserted general interest on the part of non-participating EPA employees.

As noted above, PEER contends that it seeks only disclosure of the facts related to Dr. Hammer's allegations, not the names or particulars of the interviewees, and thus it suggests that redaction of all names is a well-trod path to the release of these kinds of materials.  Pl. MSJ Mem. at 18 (citations omitted).  In essence, this is another argument for segregability, repeated throughout PEER's brief, and it is addressed in two ways.  First, for the reasons set forth above, the Court finds that, with the exception of the first three sections of the report, there is no factual information that can be severed from otherwise exempt material, and thus redaction of names is not a solution.  Second, the Court does not find that Exemption 6 applies to the entire Report.  As discussed below in the Court's segregability analysis, redaction of Exemption 6 information is an appropriate tool that allows for the first three sections of the Maida Report to be disclosed to PEER.

### C.  Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b)(9); *see also Oglesby v. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996).  An agency must produce any "reasonably segregable" information—that is, information that can be separated from the exempt portions of a document—unless the exempt and non-exempt

17

portions are "inextricably intertwined with exempt portions." *Trans–Pacific Policing Agreement v. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999); *Mead Data Cent.*, 566 F.2d at 260.  An agency must provide a "detailed justification" and not just "conclusory statements" to prove that it has released all reasonably segregable information.  *Mead Data Cent.*, 566 F.2d at 261.

       One preliminary legal matter is clear—contrary to its argument, EPA is not entitled to withhold the entirety of the Maida Report on the basis that the deliberative process privilege under Exemption 5 protects some of the report.  While such automatic exemption is possible when the work-product doctrine of Exemption 5 is at issue, "[f]actual material is not protected under the deliberative process privilege [of Exemption 5] unless it is inextricably intertwined with the deliberative material." *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 370–72 (D.C. Cir. 2005) (internal citations and quotation marks omitted).  There is, of course, some difficulty in demonstrating that protected and non-protected information are "inextricably intertwined" without examples that would, perforce, release the protected information.  Thus, EPA has struggled to submit an affidavit to show this necessity without actually revealing it.

       The Court has now reviewed the Maida Report and agrees in the main with EPA. Other than the first three sections of the report, Exemptions 5 and/or 6 protect the report from disclosure.  The material is inextricably intertwined with Dr. Maida's analysis and opinions, cannot be segregated, and is protected by the Exemption 5 deliberative process privilege and/or Exemption 6.  The first three sections of the report, for the reasons discussed above, are not protected by Exemption 5, and the Court finds that they are "purely factual" material that can be reasonably segregated and must be disclosed.  *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (*per curiam*).  However, PEER does not object to the redaction of the personal

identifying information in those three sections, *see* Pl. MSJ Mem. at 18, which the Court also finds to be separately protected by Exemption 6 and segregable.

Accordingly, the Court upholds EPA's decision to withhold the Maida Report under FOIA except as to the first three sections of the report—i.e., "Introduction," "Methodology," and "Documents That Were Reviewed."  EPA shall produce to PEER only these sections of the Maida Report, with the personal identifying information (including names and titles) of all persons in the "Methodology" section redacted.  *See* 5 U.S.C. § 552(a)(4)(B) (providing that a United States district court has jurisdiction "to order the production of any agency records improperly withheld from the complainant").

## IV.  CONCLUSION

The parties' cross-motions for summary judgment will be granted in part and denied in part.  EPA will be directed to provide to PEER the first three sections of the Maida Report with personal identifying information redacted, and to this extent, PEER's motion for summary judgment will be granted.  In all other respects, the Court will grant EPA's motion for summary judgment.  A memorializing Order accompanies this Opinion.

DATE: February 26, 2013

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge